*In re* BREWSTER STREET HOUSING SITE.

1. STATUTES—PURPOSE OF UNITED STATES HOUSING ACT.

The purpose of the United States housing act is threefold: (1) to decentralize housing construction by withdrawing the Federal government from housing activity; (2) to insure the continuation of a housing program by the States; and (3) to eliminate substandard homes and confine low-cost housing to persons in the low-income groups (50 Stat. at L. 888 *et seq.*).

2. MUNICIPAL CORPORATIONS—PUBLIC HOUSING—FINANCIAL ASSISTANCE OF UNITED STATES.

Under the United States housing act loans by the United States to various public housing agencies may be as high as 100 per cent. of the total cost if repaid within a period not to exceed 60 years plus interest whereas if annual contributions are made then the loans may not exceed 90 per cent. of the development or acquisition cost of the project (50 Stat. at L. 891).

3. CONSTITUTIONAL LAW—LEGISLATIVE POWER.

Only such legislative power is vested in congress as is granted to it by the Constitution of the United States, the powers not so delegated nor prohibited by it to the States being reserved to the States or to the people and enumeration in that Constitution of certain rights is not to be construed as denying or disparaging others retained by the people (U. S. Const., art. 1, § 1, ams. 9, 10).

4. SAME—DIVISION OF LEGISLATIVE POWER BETWEEN STATE AND FEDERAL GOVERNMENTS.

The several States, when organized, succeeded to all of the legislative powers within their respective territorial jurisdictions possessed by the parliament of England and still possess them except as they have been delegated by the States to the Federal government by the Constitution of the United States or voluntarily restrained by the people through the Constitution of the State.

5. SAME—CONSTRUCTION OF STATE AND FEDERAL CONSTITUTIONS.

The Constitution of a State is not a grant of power to the legislature but is a limitation upon its powers while the Constitution of the United States is a delegation of power to the Federal government.

6. SAME—CONSTRUCTION OF STATUTES—LEGISLATIVE POWER.

To sustain the constitutionality of Federal legislation it is necessary to point out where the power to enact the legislation is granted to the congress of the United States by the Constitution of the United States; but in passing upon State legislation, it is necessary to point out in the Constitution of the State the limitation which has been placed by the people through the Constitution upon the power of the legislature to act, before it may be declared unconstitutional.

7. SAME—SLUM CLEARANCE—STATE HOUSING ACT.

Provisions of State housing and slum clearance act declaring such statute immediately necessary and authorizing the condemnation of private property for housing and slum clearance projects *held*, not unconstitutional as violating any constitutional provision pointed out by parties whose lands were being condemned (U. S. Const. am. 14; Mich. Const. 1908, art. 13, § 1; Act No. 18, Pub. Acts 1933 [Ex Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

8. EMINENT DOMAIN—PROPERTY CONDEMNED MAY NOT BE GIVEN TO ANOTHER.

A State has no power and authority under the power of eminent. domain, or otherwise, to take the property of one man and give it to another.

9. CONSTITUTIONAL LAW — POLICE POWER — PUBLIC SAFETY AND HEALTH—SLUM CLEARANCE.

Since, under the police power of the State and the municipalities to whom the power of the State is delegated for the purposes of local self-government, it may condemn lands for the use of jails to protect the public peace and safety, for the use of hospitals for the benefit of the public health and the prevention of the spread of disease, or for institutions for the control and regulation of juvenile delinquency; or condemn, tear down and remove buildings inimical to public safety; the State or a city may in the exercise of the police power condemn property for slum-clearance purposes because such property may be a menace to the health, peace and safety of the inhabitants of the city other than those who occupy the premises (Const. 1908, art. 13, § 1; Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

10. SAME—STATUTES PRESUMED CONSTITUTIONAL.

All presumptions are in favor of the constitutionality of a State statute and before it may be declared unconstitutional, it is necessary to point out the limitation upon the power of the legislature which the legislation in question transcends.

11. JUDGMENT—RES JUDICATA.

A former adjudication, to be of binding force as such, must be of the same controversy, between the same parties, in another court of competent jurisdiction.

12. SAME—FEDERAL COURT—DIFFERENT PARTIES.

Decision of Federal district court that United States could not condemn lands for slum-clearance and low-cost housing projects within a State but that the State under appropriate circumstances might do so was not *res judicata* of question as to whether city might condemn same lands for such purpose, although such previous decision was in accordance with the accepted rules of constitutional construction.

13. CONSTITUTIONAL LAW—POLICE POWER—PUBLIC SAFETY—PAUPERS —LOW-COST HOUSING—EQUAL PROTECTION.

Since the State and its several authorized municipalities, under the police power, may condemn lands for jails and poorhouses, they may also, in the exercise of such power, acquire lands for slum clearance and low-cost housing projects even though on such land are erected buildings which may be leased to persons with low income and thereby benefit a particular class, as long as the law operates equally upon those within the particular class (U. S. Const. am. 14; Mich. Const. 1908, art. 13, § 1; Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

14. SAME—CLASS LEGISLATION.

Legislation is not unconstitutional because it is legislation of a particular kind and character or because it benefits a particular class if the object and purpose is legitimate and within the terms of the Constitution and the law operates equally upon those within the particular class (U. S. Const. am. 14).

15. SAME—SLUM CLEARANCE—LOW COST HOUSING—DISCRIMINATION AGAINST INDIGENTS AND CRIMINALS.

The fact that many persons who frequently inhabit slums, such as indigents and criminals, are not allowed to become tenants of buildings erected on land condemned for slum-clearance and low-cost housing projects does not make the classification, i. e., occupation by persons in the very low income group, unreasonable or discriminatory ·(U. S. Const. am. 14; Mich. Const. 1908, art. 13, § 1; Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

16. SAME—DELEGATION OF LEGISLATIVE POWER.

While legislative power may not be delegated, since it is vested in the legislature of the State, subject to the initiative, referendum and recall and the legislature cannot abdicate power thus delegated to it, it may confer the authority for the finding of facts upon administrative officers, boards or commissions.

17. SAME—DELEGATION OF POWER TO DETERMINE FACTS.

The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend.

18. Same—Delegation of Powers—Equal Protection.

Statute authorizing cities having a population of over 500,000 "to purchase, acquire, construct, maintain, operate, improve, extend, and/or repair housing facilities and to eliminate housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare," to create a commission with power to accomplish such purposes which could make a determination in what areas it is necessary to provide sanitary housing facilities for families of low income and for elimination of housing conditions injurious to public health, acquire such land by gift, purchase or condemnation and rent only to such tenants as are unable to pay for more expensive housing accommodations *held*, not unconstitutional either as discriminatory legislation or delegation of legislative power (U. S. Const. am. 14; Mich. Const. 1908, art. 13, § 1; Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

19. Statutes—Object Determined From Body of Act.

Determination as to whether a statute of this State embraces more than one object must be made from an examination of the body of the statute (Const. 1908, art. 5, § 21).

20. Same—Single Object of Act.

Act designed to provide decent, safe and sanitary dwelling accommodations for persons of low income through creation of a housing commission empowered to eliminate housing conditions detrimental to the public health, peace, safety, morals, and welfare was not unconstitutional as embracing more than one object since the establishment of the commission is but incidental to the primary object (Const. 1908, art. 5, § 21, art. 13, § 1; Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

21. Municipal Corporations—Debt Limit—State Housing and Slum Clearance Act—Self-Liquidating Revenue Bonds.

Claim that State housing and slum clearance act authorized a city to violate a statute imposing a debt limit on home rule cities in the particular that it authorizes city to issue bonds beyond the limit of bonded indebtedness *held*, untenable where bonds authorized on the project are to be self-liquidating revenue bonds (Const. 1908, art. 8, §§ 20, 21; 1 Comp. Laws 1929, § 2228 *et seq.*; Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

22. CONSTITUTIONAL LAW—EMINENT DOMAIN—POLICE POWER—PUB-
LIC HEALTH AND SAFETY—SLUM CLEARANCE—LOW-COST HOUSING.
    Recourse to the power of eminent domain may be had where it is
    justifiable only under the police power but where property is
    taken for public health and safety, such as for use in slum
    · clearance and low-cost housing purposes, it cannot be taken
    without compensation (Act No. 18, Pub. Acts 1933 [Ex. Sess.],
    as amended).

23. EMINENT   DOMAIN—JURY—FINDINGS—NECESSITY—COMPENSA-
TION.
    Proceedings for the condemnation of property are not tried be-
    fore a court, a jury of 12 freeholders residing in the vicinity of
    the property condemned being a constitutional tribunal to
    determine necessity and fix compensation if it found necessity
    for a taking for a public use (Const. 1908, art. 13, § 2).

24. SAME—REVIEW BY APPELLATE COURT.
    When proceedings to condemn lands for public use are tried be-
    fore a jury they will not be reviewed by an appellate court in
    the same manner as if the proceeding were one tried before a
    court and jury according to the course of the common law and
    an appellate court will not interfere unless errors complained of
    are such as may fairly be said to have a controlling influence in
    securing the result (Const. 1908, art. 13, § 2).

25. SAME—ADMISSION OF TESTIMONY—SUBSTANTIAL INJUSTICE.
    In condemnation proceedings under city charter the practice
    respecting admission of testimony should be as simple as a due
    regard to substantial justice would permit, a large discretion
    being left to the jury or to the attending officer, where there is
    one, and on appeal an award will not be disturbed unless it is
    fairly evident that rulings made were not only inaccurate but
    were a cause of substantial injustice to the appellant (Act No.
    18, Pub. Acts 1933 [Ex. Sess.], as amended; Detroit Charter,
    title 8).

26. EVIDENCE—QUALIFICATIONS OF WITNESSES TO TESTIFY AS TO
VALUE OF LAND.
    One does not have to be an expert to testify as to the value of
    land as any ordinary individual who has the testamentary quali-
    fication of knowledge of the question about which he attempts
    to testify may testify as to the value of land.

27. EMINENT DOMAIN—VALUE OF LAND—EVIDENCE.

Testimony as to sales and offers of sales of land in the vicinity of that sought to be condemned was properly admitted for the purpose of showing that the witnesses had some knowledge of the value of lands in the vicinity upon which to form an opinion of the value of the lands in question.

28. SAME—EXPERT OPINION AS TO VALUE OF LAND.

Since proceedings to condemn lands are inquisitorial in character and ordinarily jurors are drawn from the vicinity, are freeholders and know something of the value of the lands sought to be condemned, they usually pay little or no attention to the wranglings of counsel, the statements by the trial court, or the contentions of attorneys and determine and fix the value of land after a consideration and discussion of the various things brought to their attention deemed worthy of consideration, hence admission of testimony of so-called experts was not reversible error.

29. TRIAL—REMARKS BY JUDGE—PREJUDICE TO COMPLAINING PARTY.

Though the conduct and language upon the part of the trial judge in a case tried according to the course of the common law which indicates his bias, prejudice, or the bent of his mind may be reversible error, such remarks are reversible only when they prejudice the rights of the complaining party.

30. EMINENT DOMAIN—ERRONEOUS INSTRUCTIONS—CURING ERROR.

In condemnation proceedings, if a judge erroneously charges the jury but as part of the same charge gives them to understand that it is for them to determine whether it was necessary for the public to condemn the land in question, such erroneous charge would not justify a reversal.

31. SAME—PREJUDICIAL REMARKS BY JUDGE.

In condemnation proceedings for slum clearance and low-cost housing purposes in which judge who presided made remarks at close of trial relative to necessity for condemnation of property for such purpose which defendants claim were prejudicial but followed them immediately by instructions to jurors that they were to use their own judgment, jurors rendered a verdict two days later and awarded appellants $5,000 more than values placed upon the property by petitioner's witnesses, which verdict was fairly within the range of the testimony, such claimed prejudicial remarks *held*, not reversible error (Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

32. SAME—CLAIMED PREJUDICIAL REMARKS OF COUNSEL.

In proceedings to condemn land for slum clearance and low-cost housing site, jury *held*, not prejudiced by conduct of counsel for petitioner in indulging in personalities and derogatory remarks both during trial and in closing argument to jury where resort to personalities was not confined to counsel for petitioner (Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]).

33. SAME—AMENDMENT OF PETITION—DISCRETION OF COURT—CHARTERS.

In proceedings to condemn land under city charter for a housing project, trial court's allowance of petitioner's motion to amend petition after conclusion of testimony so as to show proceedings were instituted to condemn property for slum-clearance as well as for low-cost housing purposes, *held*, within discretion of trial court and authorized by city charter and not an abuse of discretion, where case was tried upon the theory that purpose was for slum-clearance as well as for low-cost housing, first witness so testified and cross-examination indicates that counsel for defendants had not been misled (Act No. 18, Pub. Acts 1933 [Ex. Sess.], as last amended by Act No. 5, Pub. Acts 1938 [Ex. Sess.]; Detroit Charter, title 8, chap. 1, § 10).

Appeal from Recorder's Court of Detroit; Jeffries (Edward J.), J. Submitted October 19, 1939. (Docket No. 144, Calendar No. 40,760.) Decided December 19, 1939.

Condemnation proceedings by City of Detroit, a municipal corporation, against Abraham Falk and wife, Israel Schuster and wife, Florence K. Weber, Frank J. Weber and Anna Shevitz to obtain sites for a housing project. From verdict and judgment rendered, defendants appeal. Affirmed.

*Raymond J. Kelly* and *John P. O'Hara,* Corporation Counsel, and *James H. Lee* and *Vance G. Ingalls,* Assistants Corporation Counsel, for plaintiff.

*Joseph B. Beckenstein,* for defendant Frank J. Weber.

*Richard S. Weber,* for defendant Florence K. Weber.

*Levin, Levin & Dill,* for defendants Schuster and Falk.

*Sidney M. Shevitz,* for defendant Shevitz.

POTTER, J.   This is an appeal from a proceeding under Act No. 18, Pub. Acts 1933 (Ex. Sess.), as amended,* and ordinance 262-C of the city of Detroit, as amended, to establish the necessity for the use of, and compensation to be paid for, five parcels of land sought to be obtained by the city of Detroit for a housing project.

Appellants' property is located in certain blocks in the city of Detroit, the remainder of which has been acquired by the Detroit housing commission for low-cost housing purposes.   With the exception of appellants' parcels, the project includes all of the property in 11 blocks in Detroit between Mack avenue on the north, Brewster street on the south, Beaubien street on the west, and Hastings street on the east.   Appellants' property is situated in the two blocks on Mack avenue at the northern end of the project and in the one block on Brewster street at the south.   These three blocks are referred to in the record as blocks 5, 6 and 11.

Since the beginning of the project under the national industrial recovery act, title 2, in 1933 (48

---

* See Comp. Laws Supp. 1935, § 2607–1 *et seq.,* Stat. Ann. § 5.3011 *et seq.*—REPORTER.

Stat. at L. 200 *et seq.* [40 USCA, § 401 *et seq.*], low-cost dwellings have been erected upon all of the blocks excepting upon blocks 1, 5, 10 and 11. These accommodations provide for 703 families. Because of continued crowded and unsanitary conditions in the district, the common council of the city of Detroit, acting upon the recommendations of a special investigating committee headed by the council president, voted to extend this project, known as the Brewster housing project, to provide for 248 more families. To this end, plans were made to erect low-cost housing apartments upon blocks 5 and 6, and to provide recreational facilities upon all of the property in block 11. In order to own all of the property in blocks 5, 6 and 11, condemnation proceedings were begun by the city before the late Judge Jeffries in the recorder's court, and from a jury finding for the city appellants appeal to this court claiming unconstitutionality of the Michigan housing act and ordinances of the city of Detroit and numerous errors by the court below.

In 1933, the congress of the United States, as part of its public works program, provided by the national industrial recovery act, title 2, for the spending of money for low-cost housing and slum-clearance projects. 48 Stat. at L. 195 (40 USCA, § 401 *et seq*). The program was directed by a Federal emergency administrator of public works who was empowered, upon such terms as the president should prescribe, to make grants to states, municipalities, or other public bodies for the construction, improvement, or repair of low-cost housing and slum-clearance projects, and to acquire by purchase or the power of eminent domain any real or personal property in connection with the construction of such project. See 48 Stat. at L. 201, 202 (40 USCA, §§ 402, 403 [a]).

Congress appropriated $3,300,000,000 to carry on the purposes of the act.

In order to make the State eligible to participate, the governor summoned the Michigan legislature to an extra session convening November 22, 1933. While in session, the legislature received a message from the governor which stated in effect that the national industrial recovery act had appropriated $3,300,000,000 for public works; that, although the people of Michigan were paying their proportion of the appropriated fund, the State and its municipal subdivisions had failed to qualify a single project; that the reason for the failure to qualify was constitutional prohibitions which could be surmounted only by the passage of emergency legislation dealing with the subject; and to that end he presented to the legislature for its consideration a housing bill, drafted by the corporation counsel of the city of Detroit and approved by the public works administrator, which was designed to permit Michigan municipalities to undertake such work. House Journal 1933 (Ex. Sess.), pp. 89, 90.

The legislature, January 9, 1934, passed Act No. 18, Pub. Acts 1933 (Ex. Sess.). Section 2 provides that any city or incorporated village having a population of over 500,000 is authorized "to purchase, acquire, construct, maintain, operate, improve, extend, and/or repair housing facilities and to eliminate housing conditions which are detrimental to the public peace, health, safety, morals, and/or welfare." Section 3 authorizes any city with a population of over 500,000 to create by ordinance a commission with power to accomplish the purposes set forth in section 2. Section 4 provided that the commission should consist of five members who should serve for five years without compensation to be appointed by

the governor. Act No. 80, Pub. Acts 1935, amended section 4 to provide that the commission shall consist of five members to be appointed by the chief administrative officer of the city or incorporated village. Section 7 provides that the commission shall have the power and duty: (a) to determine in what areas of the city it is necessary to provide sanitary housing facilities for families of low income and for elimination of housing conditions injurious to public health; (b) to purchase, lease, sell, exchange, transfer, assign and mortgage any property, real or personal, or any interest therein, or acquire the same by gift, bequest, or under the power of eminent domain; to own, hold, clear and improve such property, or alter, improve or extend; to lease or operate any housing project or projects; (c) to rent only to such tenants as are unable to pay for more expensive housing accommodations. Section 10 provides that the commission may recommend to the governing body the prosecution of eminent domain proceedings. It also says:

"Housing projects contemplated by this act are hereby declared to be for public purposes within the meaning of the Constitution, State laws and charters relative to the power of eminent domain."

Section 17 which provided the commission might borrow money and issue bonds therefor, and section 27 which provided for rentals, were both substantially amended in 1938 by Act No. 5, Pub. Acts 1938 (Ex. Sess.).

Section 40 states:

"This act, being necessary for and to secure the public peace, health, safety, convenience and welfare of the cities and incorporated villages and the people of the State of Michigan, shall be liberally construed to effect the purposes thereof."

Section 43 recites that, whereas, there is a demand in congested sections of Michigan for housing of families of low income and for the reconstruction of slum areas and no existing laws or charters provide for the organization of public housing commissions as contemplated in the national industrial recovery act, "this act is hereby declared to be immediately necessary for the preservation of the public peace, health, safety, convenience and welfare of the people of the State of Michigan."

After the passage of this act, the city of Detroit adopted ordinance 262-C creating the Detroit housing commission, whose members were to be appointed by the governor, and whose powers were the same as those enumerated in section 7 of the Michigan housing act. The ordinance was approved by Mayor Frank Couzens, January 15, 1934. Pursuant to the authority vested in it by this legislation, the Detroit housing commission undertook a study of housing conditions in the city of Detroit. This study indicated that nowhere else were housing conditions more inadequate and unsanitary than in the district on Hastings street. Accordingly, 10 city blocks between Mack avenue on the north and Brewster street on the south were selected as the site of the first project.

April 17, 1935, a petition was filed in the Federal district court in Detroit by the emergency administrator of public works to condemn the selected area. Among the parcels of land sought to be condemned were the same five parcels involved here. While a hearing on this petition was pending, the United States circuit court of appeals for the sixth circuit, July 15, 1935, sustained a demurrer to a petition brought by the Federal emergency administrator to condemn four city blocks in the city of Louisville for

low-cost housing and slum-clearance. The court held:

"In the exercise of its police power, a State may do those things which benefit the health, morals, and welfare of its people, but the Federal government has no such power within the States." *United States* v. *Certain Lands in City of Louisville* (C. C. A.), 78 Fed. (2d) 684.

October 23, 1935, the Federal district court at Detroit, finding that the issues presented to it were identical with the issues in the *Louisville Case* and feeling bound by the Louisville decision, sustained a motion to dismiss the condemnation proceedings on the ground that they were not for a public use under the Federal Constitution. *United States* v. *Certain Lands in City of Detroit,* 12 Fed. Supp. 345. All attempts by the United States to acquire the Detroit property by condemnation were abandoned, options were taken, and all of the land in the before-mentioned area, with the exception of the five parcels involved in the present proceedings, was acquired by voluntary purchase.

Meanwhile, the congress of the United States, finding its housing program impaired by the Louisville decision, passed an act, September 1, 1937, which sought to preserve the housing program and avoid the unconstitutional provisions of the national industrial recovery act, title 2 (48 Stat. at L. 200 *et seq.* [40 USCA, § 401 *et seq.*]), 50 Stat. at L. 888 (42 USCA, § 1401 *et seq.*). This act, the United States housing act, had a threefold purpose: (1) to decentralize housing construction by withdrawing the Federal government from housing activity; (2) to insure the continuation of a housing program by the States; and (3) to eliminate substandard homes and confine low-cost housing to persons in the low-income groups. It limits the activity of the Federal govern-

ment to financing State and municipal housing authorities who will condemn property, establish rental rates and conditions of occupancy. To accomplish the second purpose, the act provides that there shall be created in the department of the interior a United States housing authority which may render financial assistance to municipal housing agencies by (a) loans; (b) loans, plus annual contributions; (c) capital grants. Loans may be as high as 100 per cent. of the total cost if repaid within a period not to exceed 60 years, at the going rate of interest plus one-half of one per cent. If annual contributions are made, then the loans may not exceed 90 per cent. of the development or acquisition cost of such project. In order to make sure that the money loaned will be spent for low-cost housing and for persons in the low-income groups, the act sets up conditions which the local housing commission must follow. The more important of these conditions are: (1) persons eligible must be in the lowest income group, for whom private enterprise cannot afford to build an adequate supply of decent, safe and sanitary dwellings; (2) the persons who occupy the dwellings must be persons whose net income does not exceed five times the rental (including the value or cost to them of heat, light, water and cooking fuel), except that in the case of three or more dependents such ratio shall not exceed six to one; (3) the average construction cost shall not exceed the cost of dwellings currently produced in the locality by private enterprise; (4) no annual contributions shall be made unless the the project includes the elimination by demolition, condemnation, and effective closing, or the compulsory repair of unsafe or unsanitary dwellings situated in the locality or the metropolitan area, substantially equal in number to the number of newly constructed dwellings provided by the project. In

order to withdraw the Federal government from the management of housing projects, it was provided by section 12 (b) (50 Stat. at L. 894 [42 USCA, § 1412 (b)]) that "as soon as practicable the authority shall sell its Federal projects or divest itself of their management through leases."

Following the passage of the Federal housing act, the city of Detroit, January 12, 1938, passed ordinance 46-D which (1) amended ordinance 262-C so as to provide that members of the Detroit housing commission would be appointed by the mayor; (2) set forth rental standards the same as enumerated in the United States housing act. To secure annual contributions in addition to loans, the city of Detroit, May 18, 1938, passed ordinance 66-D which provided there should be a demolition or improvement of substantially as many unsafe and unsanitary dwellings as there were new buildings to be erected. August 1, 1938, the Federal housing authority, acting under section 12 (b) of the Federal housing act, leased all the blocks it had acquired by voluntary sale, with the exception of blocks 5, 6 and 11, to the Detroit housing commission for a term ending June 30, 1940. The property in blocks 5, 6 and 11 was not leased to the commission because it was in those blocks that the parcels owned by appellants herein were located. As title to the property would be in the city upon condemnation, and as it would be unsatisfactory to have a low-cost apartment part of which would stand on property owned in fee and part of which would stand on property held by lease, it was agreed that the property in blocks 5, 6 and 11 would be sold by the housing authority to the Detroit housing commission. This was done, and the sale approved by the common council September 19, 1939.

Before this time, Act No. 18, Pub. Acts 1933 (Ex. Sess.), was amended with a view towards securing

funds under the new Federal act. Changes unimportant in the present controversy were made by Act No. 265, Pub. Acts 1937. September 8, 1938, the legislature, in special session, on recommendation of the governor (Senate Journal 1938 [Ex. Sess.], p. 11), made certain amendments and additions to Act No. 18, Pub. Acts 1933 (Ex. Sess.), by Act No. 5, Pub. Acts 1938 (Ex. Sess.). Sections 2 and 3 were amended to provide that any city may by ordinance create a housing commission to construct low-cost housing facilities and eliminate housing conditions detrimental to the public peace, health and welfare. Section 17 provides that for the purpose of defraying the cost of purchasing, constructing, extending or repairing any housing project any commission may borrow money and issue bonds therefor. This section also provides that bonds may be sold to the United States housing authority upon certain enumerated conditions. Section 27 requires all housing commissions to follow certain minimum rental requirements. These requirements are drawn so as to fit together with the conditions in the Federal housing act for the expenditure of loans and in effect provide that rentals shall be fixed at the lowest possible rates consistent with providing decent, safe and sanitary dwelling accommodations, and with setting up during not less than six years following the issuance of the bonds a reserve sufficient to meet the largest principal and interest payments which will be due on such bonds in any one year thereafter, and to maintain such reserve. Section 44 establishes standards for the selection of tenants and the establishment of rentals. These standards are the same as those required in the United States housing act of 1937, and in ordinance 46-D, § 22, of the city of Detroit. Among the conditions, all of which are de-

signed to preserve the low-cost characteristics of the project, are the following: (a) the commission may rent only to persons of low income; (b) no person shall be accepted if he has an annual net income in excess of five times the annual rental, except that in the case of persons with three or more minor dependents the ratio shall not exceed six to one; (c) rentals must be only at rates within the financial reach of such persons of low income.

After a special investigating committee appointed by the common council recommended further low-cost projects, the common council voted to extend the Brewster facilities so as to accommodate 248 more families. October 11, 1938, a petition was filed by the city of Detroit in the recorder's court for the condemnation of appellants' lands. The financing of the extension is under the United States housing act of 1937. Against the cost of these projects, bonds are to be issued by the city of Detroit. The Federal government is to purchase 90 per cent. of the bonds, the remaining 10 per cent. to be purchased locally. In addition to the amounts received upon the sale of the bonds, the Federal government will provide annual contributions amounting to $3\frac{1}{2}$ per cent. of the amount of the bonds during the life of the bond issue. The projects are set up on a 60-year basis. Management is under the Detroit housing commission which is free to adopt rental fees and conditions of occupancy, except insofar as restricted by the general conditions set forth in 50 Stat. at L. 888 (42 USCA, § 1401 et seq.).

February 3, 1939, after the proofs had been fully taken and arguments heard, petitioner moved to amend the petition of October 11, 1938, by adding the words "and for slum clearance" after the words "low income" so that the petition would read that

the proceedings were "for the acquiring of additional land for the Brewster street housing site for the construction of housing facilities for persons of low income and for slum clearance." The motion was granted and, February 9, 1939, the jury returned a finding that the taking was necessary for the use and benefit of the public, and that the compensation should be $22,367. From the testimony at the trial, it appears that parcels 1, 2 and 3 are incumbered with old dilapidated buildings. Parcel 2 is used as a junk yard. On parcels 4 and 5 there are rather attractive frame buildings. Expert appraisers for petitioner valued the parcels at $800, $7,500, $1,300, $4,375 and $2,750 respectively. Values testified to by witnesses for appellants were considerably higher. The finding of the jury was $1,020 for parcel 1; $8,635, plus $1,000 for damage to business, plus $240 for moving costs, for parcel 2; $3,275 for parcel 3; $4,997 and $3,200 for parcels 4 and 5.

The 35 assignments of error have been condensed into 8 major issues.

The question of most importance is that of the constitutionality of the legislation under consideration.

Act No. 18, Pub. Acts 1933 (Ex. Sess.), as amended, and ordinance 262-C of the city of Detroit, as amended, are attacked as unconstitutional, (1) in that they violate the 14th amendment of the Federal Constitution and article 13, § 1, of the Constitution of the State (1908); (2) it is claimed Act No. 18, Pub. Acts 1933 (Ex. Sess.), as amended, is class legislation and, therefore, unconstitutional; (3) that Act No. 18, Pub. Acts 1933 (Ex. Sess.), as amended, is an unconstitutional delegation of legislative power to the Detroit housing commission; and (4) that Act No. 18, Pub. Acts 1933 (Ex. Sess.), as amended,

violates article 5, § 21, of the Michigan Constitution (1908) which provides that no law shall embrace more than one object, which shall be expressed in its title.

The Constitution of the United States does not vest all legislative powers in the congress of the United States, but vests therein "all legislative powers herein granted." The legislative powers granted are specifically enumerated in the Constitution and congress is empowered to make all laws which shall be necessary and proper for carrying into execution the powers vested in the government of the United States. Although it seems clear that all legislative powers not delegated through the Constitution to the congress of the United States are reserved to the people, by reason of the peculiar character of the government created by the Constitution it was thought wise to establish and declare definite rules for the construction of that instrument: (1) "The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people" (U. S. Const. am. 9); and (2) "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people" (U. S. Const. am. 10). The legislative power of the several States stands upon a different footing. By the Declaration of Independence, all political connection between the colonies and the State of Great Britain was declared to be dissolved and the colonies asserted to be free and independent States. The several States, when organized, succeeded to all of the legislative powers within their respective territorial jurisdictions possessed by the Parliament of England, and as such free and independent States they still possess those powers, ex-

cept insofar as they have been delegated by the
States to the Federal government by the Constitu-
tion of the United States or voluntarily restrained
by the people through the Constitution of the State.
There is a broad distinction, therefore, between the
rules which govern in construing the Constitution
of the United States and the Constitution of the
State.   The Constitution of the State of Michigan is
not a grant of power to the legislature, but is a
limitation upon its powers (*Attorney General* v.
*Preston,* 56 Mich. 177), while the Constitution of the
United States is a delegation of power to the Federal
government (*Moore* v. *Harrison,* 224 Mich. 512).

To sustain the constitutionality of Federal legisla-
tion when its constitutionality is involved, it is nec-
essary to point out where in the Constitution of the
United States the power to enact the legislation is
expressly or by necessary and proper implication
granted to the congress of the United States.   In
passing upon the constitutionality of State legisla-
tion, it is necessary to point out in the Constitution
of the State the limitation which has been placed by
the people through the Constitution upon the power
of the legislature to act, before it may be declared
unconstitutional.

Though Mr. Justice McALVAY, in *Attorney Gen-
eral, ex rel. Barbour,* v. *Lindsay,* 178 Mich. 524, held
that no authority is given to the legislature of the
State by the Constitution of Michigan to declare an
emergency, this was not, and could not well have
been, the holding of the court.   The question is not
whether authority has been expressly given to the
legislature by the Constitution to declare an emer-
gency, but whether, considering the Constitution of
the State as a whole, it expressly or by necessary
implication denies to the legislative department of

the State the power to declare an emergency, a power which it undoubtedly has and may exercise, there being no limitation placed upon its powers by the people through the State Constitution.

*United States* v. *Certain Lands in City of Louisville, supra,* and *United States* v. *Certain Lands in City of Detroit, supra,* held the Federal government did not possess the power to condemn lands under circumstances analogous to those involved in this case. In the latter case, the five specific parcels here involved were attempted to be condemned under the power of eminent domain by the Federal government. The Federal government being but a government of delegated powers, those who sought the condemnation of this specific property were unable to point out where in that instrument the power to condemn the lands in question was specifically granted by the people to the Federal government. An entirely different question is here involved. In order to hold that the statute and ordinance in question violate the Constitution of the State, it is necessary to point out specifically what provision or provisions of the Constitution of the State prohibit the enactment of the legislation in question. We find nothing in that instrument which prevents or prohibits the legislation in question. There being nothing in the Constitution of the State to prohibit the legislature from passing the legislation in question, it must be conceded it had the power to enact it.

Upon principle and authority, the State has no power and authority under the power of eminent domain, or otherwise, to take the property of one man and give it to another. And it may well be that if no other question was involved, legislation to that effect would be unconstitutional. There can

be no question about the power of the State, or of
municipalities to whom the power of the State is
delegated for the purposes of local self-government,
to condemn lands for the use of jails to protect the
public peace and safety from those who would in-
terrupt or disturb it.   There can be no question
of the power of the State, or of the municipalities
to whom that power is delegated, to condemn land
for the use of hospitals for the benefit of the public
health and the prevention of the spread of disease.
Such legislation is concededly in the interest of the
public.   The State is already directly engaged in
the maintenance of institutions for the control and
regulation of juvenile delinquency and no one has
ever questioned the power of the State to acquire
property for the erection of buildings devoted to
that purpose either by direct legislative appropri-
ation and purchase or under the power of eminent
domain.   There can be no doubt but that the State,
and, in general, municipal corporations, under the
police power, may condemn, tear down and remove
buildings which are inimical to the public safety by
reason of their inherent weakness or because they
constitute a fire hazard; and, upon principle, there
seems to be no reason why the State, in the exercise
of its police power, may not delegate the power and
authority to the city of Detroit under the act in
question to condemn property for what may be
termed slum-clearance purposes because such prop-
erty may be a menace to the health, peace and safety
of the inhabitants of the city other than those who
occupy the premises.   All presumptions are in
favor of the constitutionality of the legislation and
before it may be declared unconstitutional, it is
necessary to point out the limitation upon the power
of the legislature which the legislation in question

transcends. In the cases in the several States where this question has been involved, the courts have uniformly held that legislation of the kind and character of that involved here is within the legislative power of the State for the taking of property thereunder for a public use. *New York City Housing Authority v. Muller,* 270 N. Y. 333 (1 N. E. [2d] 153, 105 A. L. R. 905); *Spahn v. Stewart,* 268 Ky. 97 (103 S. W. [2d] 651); *In re Opinions of the Justices,* 235 Ala. 485 (179 South. 535); *Wells v. Housing Authority of the City of Wilmington,* 213 N. C. 744 (197 S. E. 693); *State, ex rel. Porterie, Attorney General, v. Housing Authority of New Orleans,* 190 La. 710 (182 South. 725); *Dornan v. Philadelphia Housing Authority,* 331 Pa. 209 (200 Atl. 834); *Marvin v. Housing Authority of Jacksonville,* 133 Fla. 590 (183 South. 145); *Williamson v. Housing Authority of Augusta,* 186 Ga. 673 (199 S. E. 43); *McNulty v. Owens,* 188 S. C. 377 (199 S. E. 425); *Rutherford v. City of Great Falls,* 107 Mont. 512 (86 Pac. [2d] 656); *Knoxville Housing Authority v. City of Knoxville,* 174 Tenn. 76 (123 S. W. [2d] 1085); *Krause v. Peoria Housing Authority,* 370 Ill. 356 (19 N. E. [2d] 193); *Edwards v. Housing Authority of City of Muncie,* 215 Ind. 330 (19 N. E. [2d] 741; *Chapman v. Huntington, W. Va., Housing Authority,* — W. Va. — (3 S. E. [2d] 502); *Housing Authority of County of Los Angeles v. Dockweiler,* 14 Cal. [2d] 437 (94 Pac. [2d] 794); *Romano v. Housing Authority of City of Newark,* 123 N. J. Law, 428 (10 Atl. [2d] 181); *Allydonn Realty Corporation v. Holyoke Housing Authority,* — Mass. — (23 N. E. [2d] 665). .

As said in *Knoxville Housing Authority v. City of Knoxville, supra*:

"The courts reason that the primary object of all government is to foster the health, morals and

safety of the people. That slum districts with their filthy, congested, weather-exposed living quarters are breeding places of disease, immorality and crime. The character of the houses in such districts make of them a fire hazard. The existence of such districts depresses the taxable value of neighboring property and deprives the State of revenue. The State is also put to great expense in combating disease, crime and conflagration originating in such localities. They menace not only the health, safety and morals of those living therein, but since disease, crime, immorality and fires can with difficulty be confined to points of origin, these districts are a menace to the whole community—indeed, a menace to the State.

"Without dissent, therefore, the courts have reached the conclusion that slum clearance was a public purpose and that housing authorities serve a public use."

It is contended, however, that the judgment entered in the condemnation proceedings instituted by the United States in the Federal court in the city of Detroit for the condemnation of the particular parcels of land here involved is *res judicata* and a bar to this proceeding. The decision in *United States* v. *Certain Lands in City of Detroit, supra,* was based upon the decision of the circuit court of appeals in *United States* v. *Certain Lands in City of Louisville, supra,* in which that court held that low-cost housing and slum-clearance might be for the public welfare, but that the Federal government, being a government of delegated powers, could not itself enter the State and condemn the property of private citizens for the benefit of the public health, peace, safety and welfare of the people of the State. One of the elements necessary to the binding force of a former adjudication is that that adjudication be what it purports to be,—a former adjudication

of the same controversy, between the same parties, in another court of competent jurisdiction. The adjudication by the Federal court in the city of Detroit in the proceeding brought by the United States to condemn the lands in question was not between the same parties. It was between the government of the United States and the defendants. The city of Detroit was not a party to such proceeding and is not bound by the judgment entered therein. The case was disposed of upon the ground the government of the United States had no right to engage in the slum-clearance and low-cost housing business in the city of Detroit and, therefore, had no right to condemn the property of the defendants to use in a business in which it had no right to engage. The holding in that case indicated that although the government of the United States could not condemn the property in question, the State under appropriate circumstances might do so. The decision in the Federal court was in accordance with the accepted rules of constitutional construction, but it is not *res judicata* of the question here involved.

It is contended the legislation in question is class legislation and, therefore, violative of the Constitution. There can be no question but that the State, and the several municipalities thereof when authorized so to do, are vested with the constitutional power to acquire by the exercise of the power of eminent domain lands for the construction of jails for the incarceration of those convicted of crime. Through its several municipalities authorized to exercise it, the power of eminent domain may be employed for the acquisition of property for the erection of poorhouses for the care of those who are indigent or unable to care for themselves. The legislation in question does not undertake to authorize the exercise of the power of eminent domain for

these purposes, but it does undertake to authorize the exercise of the power of eminent domain for the purpose of acquiring lands, not only for the purposes of slum-clearance, but for the construction of so-called low-cost housing,—that is, for the purpose of erecting upon the lands so acquired buildings which may be leased to persons with low incomes. Though we may not agree with the economic reasoning lying back of the legislation, we are not prepared to say that it violates any constitutional limitation of the State, is class legislation, or denies to anyone the equal protection of the law. Legislation is not unconstitutional because it is legislation of a particular kind and character, or because it benefits a particular class. If the object and purpose of the legislation is legitimate and within the terms of the Constitution, the mere fact that there is a classification, so long as the law operates equally upon those within the particular class, does not render it unconstitutional. *Lundstrom* v. *Township of Ellsworth*, 196 Mich. 502; *Haynes* v. *Lapeer Circuit Judge*, 201 Mich. 138 (L. R. A. 1918 D, 233). Classification schedules similar to those prescribed by the legislation here involved have been held not to be unconstitutional in States where living costs are both higher and lower than in Detroit. *New York Housing Authority* v. *Muller, supra; State, ex rel. Porterie, Attorney General,* v. *Housing Authority of New Orleans, supra; Williamson* v. *Housing Authority of Augusta, supra; Rutherford* v. *City of Great Falls, supra; Edwards* v. *Housing Authority of City of Muncie, supra.* The fact that many persons who frequently are inhabitants of the of the slums, such as indigents and criminals, are not allowed to become tenants does not make the classification unreasonable or discriminatory.

It is contended the legislation in question consti-

tutes an improper delegation of legislative power by the State to the Detroit housing commission. It is a fundamental maxim of constitutional law that legislative power may not be delegated. The people, by the adoption of the Constitution, have vested the legislative power in the legislature of the State, subject to the initiative referendum and recall, and the legislature of the State cannot abdicate the power delegated to it by the Constitution, but it is clear the legislature may confer the authority for the finding of facts upon administrative officers, board or commissions. *Horn* v. *People,* 26 Mich. 221.

*King* v. *Concordia Fire-Insurance Co.,* 140 Mich. 258 (6 Ann. Cas. 87), may be regarded as establishing the law in this State upon this subject. Quoting *Locke's Appeal,* 72 Pa. 498 (13 Am. Rep. 716), it was said:

"The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend."

The court cited *Georgia Railroad* v. *Smith,* 70 Ga. 694, and also quoted the following with approval:

"The true distinction [said Ranney, J., in *Cincinnati, W. & Z. R. Co.* v. *Com'rs of Clinton County,* 1 Ohio St. 77, 88] is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

The rule in that case has been frequently followed. Attacks similar to that made upon the legis-

lation in question in this State have been made in
other jurisdictions and it has been uniformly held
that the legislation was not vulnerable to such at-
tacks. *Dornan* v. *Philadelphia Housing Authority,
supra; Williamson* v. *Housing Authority of Au-
gusta, supra; Rutherford* v. *City of Great Falls,
supra.*

It is contended the legislation in question is un-
constitutional because it is violative of art. 5, § 21,
of the Constitution of this State, which provides no
law shall embrace more than one object, which shall
be expressed in its title. It has been said that we
must look to the body of a statute to determine
whether it embraces more than one object. *Kent
County, ex rel. Board of Supervisors,* v. *Reed,* 243
Mich. 120. Apparently, from an examination of the
entire act of the legislature here involved, it at-
tempts to provide decent, safe, and sanitary dwell-
ing accommodations for persons of low income. In
order to do this, the legislature provided for the
creation of a housing commission and authorized
it to purchase, acquire, construct, maintain, operate,
improve, extend, and repair housing facilities. It
was given the power to eliminate housing condi-
tions detrimental to the public health, peace, safety,
morals and welfare. Ordinarily, legislation is not
invalid if it has a primary object, although inci-
dental to the attainment of that object the legis-
lature empowers a body created by it to do every-
thing deemed requisite, necessary or expedient to
accomplish the principal object to be attained. The
statute is not invalid because it embraces more than
one object.

It may not be successfully contended that the leg-
islation here involved authorizes a violation by the
city of Detroit of the debt limit imposed by the

legislature on home rule cities by Act No. 279, Pub. Acts 1909, as amended (1 Comp. Laws 1929, § 2228 *et seq.* [Stat. Ann. § 5.2071 *et seq.*]), passed in pursuance of art. 8, §§ 20, 21, Const. (1908), for the reason the bonds upon the project are to be self-liquidating revenue bonds. *Young* v. *City of Ann Arbor,* 267 Mich. 241.

It is contended recourse may not be had to the power of eminent domain to acquire the land in question, the taking of which is or may be justified only under the police power of the State. Drain laws, under which the private property of a person may be taken from him against his will, are upheld only upon the ground that such drains are necessary for the public health. *Kinnie* v. *Bare,* 68 Mich. 625. Where property is taken for public health and safety, it cannot be taken without compensation, and there is no distinction between the power of eminent domain and the police power in this regard. Russell, Police Power of the State, p. 86. In this case, the legislation involved is upheld under the police power of the State. But, if private property is to be taken for the purpose of carrying out the project in question, such property may be acquired against the will of its owner only by the exercise of the power of eminent domain. The power of eminent domain may be lawfully resorted to when authorized by the legislature to take the property of private individuals for purposes justifiable only under the police power of the State. At least 30 of the American States have enacted legislation substantially identical with that here involved, and in 17 of these States the validity of such legislation has been challenged on the ground it authorized the taking of private property for a private use. In every instance, the courts have decided that the pur-

pose was a constitutional exercise of the power of eminent domain. We think the legislation in question is not vulnerable by reason of the attack made upon it as unconstitutional for any of the reasons which have been discussed.

It is contended, however, the trial court erred in its rulings upon the admissibility of testimony. Proceedings for the condemnation of property are not tried before a court. The constitutional tribunal here involved was a jury of 12 freeholders residing in the vicinity of such property. They were charged by the Constitution of this State with the duty to determine whether there was a necessity for using such property sought to be taken, and if they found there was a necessity for taking such property for a public use, to fix the just compensation to be made therefor. This seems plain from art. 13, § 2, Const. of 1908. Proceedings under this section of the Constitution, therefore, will not be reviewed in the same manner as if the proceeding were one tried before a court and jury according to the course of the common law. *Toledo, A. A. & G. T. R. Co.* v. *Dunlap,* 47 Mich. 456; *Fort Street Union Depot Co.* v. *Jones,* 83 Mich. 415; *Fort Street Union Depot Co.* v. *Backus,* 92 Mich. 33; *Michigan, O. & I. R. Co.* v. *Monroe Circuit Judge,* 144 Mich. 44; *U. S. Gypsum Co.* v. *Kent Circuit Judge,* 150 Mich. 668; *City of Detroit* v. *Fidelity Realty Co.,* 213 Mich. 448; *Chicago, D. & C. G. T. J. R. Co.* v. *Jacobs,* 225 Mich. 677; *In re State Highway Com'r,* 249 Mich. 530; *In re Widening of South Dix Avenue,* 262 Mich. 233.

"Appellate courts should not interfere, unless the errors complained of are such as may fairly be said to have had a controlling influence in securing the result." *Fort Street Union Depot Co.* v. *Jones, supra.*

"Proceedings to condemn land are special and summary in character and, while subject to judicial review and supervision for certain purposes, are not judicial proceedings. * * * It has been the uniform practice not to interfere upon the statutory appeal to this court with the determination made by a jury in condemnation proceedings, if such determination is supported by competent testimony." *U. S. Gypsum Co. v. Kent Circuit Judge, supra.*

"Ordinarily this court will not set aside the award because of the introduction of improper evidence or improper rulings of a trial judge where one attends." *City of Detroit v. Fidelity Realty Co., supra.*

"The jury in condemnation proceedings is a jury of inquest authorized to act as judges of the law and facts, with the judge attending only in an advisory capacity. At such inquest large discretion is given the jury in taking testimony and other particulars, which does not bind them to the strict rules of evidence and technicalities of trial in *nisi prius* courts." *Chicago, D. & C. G. T. J. R. Co. v. Jacobs, supra.*

"Condemnation proceedings are inquisitorial in their nature. The constitutional tribunal for the determination of the issues is the jury; the judge, after the jury is impaneled, acting in an advisory capacity." *In re Widening of South Dix Avenue, supra.*

"The law contemplated that the practice respecting the admission of testimony in such proceedings should be as simple as a due regard to substantial justice would permit. A large discretion is left to the jury or to the attending officer, where there is one, and on appeal an award will not be disturbed unless it is fairly evident that his rulings were not only inaccurate, but were a cause of substantial injustice to the appellant. * * * While an appellate

court is bound in such cases to set aside proceedings which appear to be based on false principles, it cannot properly deal with rulings as if they were excepted to on a common-law trial, or dispose of the controversy on merely technical notions." *In re Parkside Housing Project,* 290 Mich. 582.

It is contended the court erred in permitting the so-called experts produced by petitioner to testify as to the value of the property in question. This proceeding was not a trial according to the course of the common law before a judge and jury. It was a proceeding before a constitutional jury to determine, (1) the public necessity for using the property in question; and (2) the compensation to be made to the owners thereof therefor. Alleged experts have no particular monopoly on knowledge. One does not have to be an expert to testify as to the value of land. *City of Detroit* v. *Hartwick,* 204 Mich. 635. Any ordinary individual who has the testamentary qualification of knowledge of the question about which he attempts to testify may testify as to the value of land. A lay witness will be permitted to testify as to the value of land if he has seen the land and has some knowledge of the value of other lands in the immediate vicinity. *Stone* v. *Covell,* 29 Mich. 359; *City of Detroit* v. *Hartwick, supra.* Testimony as to sales and offers of sales of land in the vicinity of that sought to be condemned was properly admitted for the purpose of showing that the witnesses had some knowledge of the value of lands in the vicinity upon which to form an opinion of the value of the lands in question. Ordinarily, jurors in condemnation proceedings are drawn from the vicinity. They are freeholders. They know something of the value of the lands sought to be condemned. The proceeding is inquisitorial in char-

acter, and ordinarily such a jury pays little or no attention to the wranglings of counsel, the statements by the trial court, or the contentions of attorneys. They determine and fix the value of the land after a consideration and discussion of the various things that are brought to their attention which they deem worthy of consideration, and make up and sign the judgment roll therefrom.

It is claimed, however, the trial court erred in his conduct of this case, in his instructions to the jury, in prejudicial statements made during the progress of the trial. The trial was lengthy, the trial judge was absent from the room during a greater part of the time during which the trial was in progress. There is no question that he made some remarks which might well have been left unsaid. He was under no legal obligation to instruct the jury. *McDuffee* v. *Fellows,* 157 Mich. 664; *Flint & P. M. R. Co.* v. *Railroad Co.,* 64 Mich. 350. Appellants refer to the following statements:

"For 10 years housing, as a part of heavy industry in Detroit and other large cities, has come almost to a standstill, outside of governmental assistance, and that notwithstanding the crying need for more sanitary, safer and convenient habitation for an ever-increasing and progressive population.

"So-called 'slums' in the city of Detroit, as well as other large cities, have been not only a breeding place for disease and a menace to health, but have been the breeding places and hideout shelters for the so-called criminal underworld, much to the danger of life and limb, and of costly expense to the taxpayer. It is estimated that the national crime bill annually is $20,000,000,000, as well as an ever-increasing challenge to organized government. Our underworld slums are the talk of the civilized world. Our slums are a disgrace to a nation with more abundance than any other nation in the world. * * *

"We are in the midst of the stream with this project, and this is one of the orthodox methods of inducting money into circulation especially when other ·channels seem to be choked with little prospects of opening, and it would seem that no reactionary construction of constitutional technicalities should be allowed to cause a collapse, and the financial debacle which would follow an adverse legal interpretation of this project. To go clear across the stream would not be as disastrous as to collapse in the middle of the stream."

An examination of the record indicates the trial court, at the conclusion of his charge, said:

"I guess that is all. Well, I would say this, of course, what I have said to you, not only during the trial, this so-called charge to you is just another contribution to assist you, if you think it is of any value, in helping you to arrive at a just verdict. You are the judges of the law and the facts. I have been somewhat puzzled myself to know whether even you could pass on the constitutionality of it, but I know who can, and I know ·who will if that question comes up. However, you are supposed to be a constitutional jury with a constitutional right to pass upon the law and the facts. However, that at least excludes me from telling you what you ought to do or what you ought not to do, as a matter of law. I have appeared before you to help maintain discipline, mostly, and to separate counsel in the clinches, and things of that sort, but aside from that I have no more to say about the results of your verdict than they have."

Though the conduct and language upon the part of the trial judge in a case tried according to the course of the common law which indicates his bias, prejudice, or the bent of his mind may be reversible error (*Schwanz* v. *Wujek*, 163 Mich. 492; *Jageriskey* v. *Railway*, 163 Mich. 631), such remarks are re-

versible only when they prejudice the rights of the complaining party (*Van Driel* v. *Stevens,* 200 Mich. 291). But in cases of this character, it has been held that even though the court improperly charged the jury, if as a part of that charge the jury were given to understand that it was for them to determine whether it was necessary for the public to condemn the land in question, such erroneous charge would not justify a reversal. *Detroit & T. S. L. R. Co.* v. *Hall,* 133 Mich. 302. The instructions here that the jury were to use their own judgment were more explicit than in *Detroit & T. S. L. R. Co.* v. *Hall, supra;* and this case is not within the rule of *In re Parkside Housing Project, supra.* There, the objectionable language was used during the course of the trial. Here, it constitutes a part of the charge of the trial judge. There, the instructions upon the part of the trial judge to disregard all previous remarks were made several days after the prejudicial statements had been used. Here, the instructions to the jury that they were to use their own judgment were made at the same time as the claimed prejudicial statements. The jury reached and rendered their verdict after two days of deliberation and awarded appellants an amount more than $5,000 greater than the values placed upon the property by the witnesses for petitioner. The verdict and judgment were fairly within the range of the testimony and we cannot say under the facts appellants were prejudiced.

Complaint is made of the language used by counsel for petitioner as prejudicial. It must be admitted that counsel for petitioner did indulge in some personalities and injected derogatory remarks during the proceedings and resorted to questionable argument in his closing comments to the jury. The

whole proceeding was marred by frequent clashes between counsel, numerous objections from either side, and the resort to personalities was not confined solely to counsel for petitioner. Evidently, the jury were not prejudiced thereby. *In re Petition of Dillman,* 263 Mich. 542.

After the testimony was concluded, the court upon the motion of petitioner permitted an amendment of the petition so as to show upon its face that the proceedings were instituted to condemn the property in question for slum-clearance as well as for low-cost housing purposes. It is clear the case was tried upon the theory it was for slum-clearance as well as for low-cost housing. The first witness for petitioner testified it was a slum-clearance project, an extension of the original Brewster project. Counsel for petitioner frequently referred to the venture as a slum-clearance project. Defendants' counsel on cross-examination interrogated petitioner's witnesses in relation to statistics on juvenile delinquency, thus indicating that he was not misled.

"Amendments either in form or substance may be allowed in any paper, petition, process, record or proceedings, * * * whenever the amendment will not interfere with the substantial rights of the parties." Charter of City of Detroit, title 8, chap. 1, § 10.

We think the amendment was within the discretion of the trial court and was authorized by the charter.

Judgment affirmed, with costs.

BUSHNELL, SHARPE, CHANDLER, NORTH, and McALLISTER, JJ., concurred with POTTER, J. BUTZEL, C. J., and WIEST, J., concurred in the result.