[Civil No. 4261. Filed May 6, 1940.]

[102 Pac. (2d) 82.]

H. C. HUMPHREY, Appellant, v. CITY OF PHOE-NIX, a Municipal Corporation; WALTER J. THALHEIMER, as Mayor of the City of Phoenix; J. R. FLEMING, REED SHUPE, H. L. WALSH and M. F. WHARTON, as Members of the Commission of the City of Phoenix; CHRIS TOTTEN, EMMETT McLAUGHLIN, ROBERT A. BECKER, C. W. BOND and J. E. REFSNES, as Members of the Housing Authority of the City of Phoenix, Appellees.

Messrs. Moore & Romley for Appellant.

Mr. Hess Seaman, City Attorney, Mr. W. C. Fields, Assistant City Attorney, for Appellees other than Housing Authority.

Mr. I. A. Jennings, for Appellee Housing Authority of the City of Phoenix.

ROSS, C. J.—H. C. Humphrey, in his own behalf as a taxpayer and in behalf of others similarly situated, commenced this action against the City of Phoenix, its governing body, and the members of the Housing Authority of such city to enjoin them from proceeding to acquire, construct and operate three proposed housing projects in said city under the provisions of chapter 82, Laws of 1939, known as the "municipal housing law."

On motion of the defendants, the court dismissed the complaint for insufficient facts on which to grant relief. The plaintiff elected to stand on his complaint and appealed from the judgment of dismissal.

■ The action was brought for the purpose of determining the constitutionality of the municipal housing law. If such law is constitutional, the complaint states no cause of action and was properly dismissed. Such law is intended to enable cities and towns of the state, in which unsafe and insanitary housing conditions exist, to remove such conditions and substitute therefor safe and sanitary dwellings for persons of low income. The law was formulated and passed by the state legislature for the purpose of permitting cities and towns of the state to take advantage of the provisions of the "United States Housing Act of 1937", 42 U. S. C. A., §§ 1401–1430, as amended The avowed purpose of this last act is stated as follows:

"§ *1401. Declaration of policy.* "It is hereby declared to be the policy of the United States to pro-

mote the general welfare of the Nation by employing its funds and credit, as provided in this chapter, to assist the several States and their political subdivisions to alleviate present and recurring unemployment and to remedy the unsafe and insanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in rural or urban communities, that are injurious to the health, safety, and morals of the citizens of the Nation.''

This act creates a corporation to be known as the United States Housing Authority, hereinafter referred to as USHA, as the agent or instrumentality of the federal government to carry out its purpose of aiding cities and towns that may undertake to rid themselves of slum areas and to convert such areas into safe and sanitary places to live. It prescribes the terms and conditions upon which it will lend the government's credit, fixes the extent and kind of assistance it will give, and places the administration of such service in the USHA. Since such law was passed, many of the states have enacted laws similar to our municipal housing law providing for a set-up meshing, in a general way, with the federal act. Such legislation empowers municipalities to accept governmental aid on the terms and conditions such aid is . offered.

The municipal housing law contains a declaration that there exists in this state unsafe and insanitary housing accommodations, in which persons of low income are forced to reside; that there is a shortage of safe and sanitary dwellings which such persons can afford to rent with their income and consequently are forced to occupy overcrowded and congested dwelling accommodations; that such conditions multiply crime and disease and menace the health, safety, morals and welfare of the residents of the state, and impair economic values; that these areas cannot be

cleared nor can the shortage of safe and sanitary dwellings be relieved through private enterprise, and that the construction of such projects would not be competitive with private enterprise; that such projects are for a public use and purpose for which public money may be spent and private property acquired and are governmental functions of state concern.

The City of Phoenix, on April 5, 1939, in pursuance of the Arizona municipal housing law, by ordinance (No. 2897), found, determined and declared that:

"(a) Insanitary and unsafe inhabited dwelling accommodations exist in the City of Phoenix, Arizona, and

"(b) There is a shortage of decent, safe and sanitary dwelling accommodations in the City of Phoenix available to persons of low income at rentals they can afford, and

"(c) There is a need for a housing authority in the City of Phoenix."

and created the Housing Authority of the City of Phoenix, consisting of five members, and delegated to such Authority the power to construct, maintain, operate and manage any housing project or projects within the city in accordance with the Arizona municipal housing law. Subsequently, on October 17, 1939, the city, by ordinance (No. 3018), delegated to its agent, the Housing Authority, all its powers under the municipal housing law except the power to borrow money, issue bonds and acquire real property. Specifically, the Authority was given the power to look after the details of locating and acquiring sites for housing projects and the construction of the projects, and to execute all contracts and agreements required by the USHA.

The city proposes to develop projects of 510 dwelling units suitable for low-income persons and to that end has authorized the issuance of its obligations

(called bonds) in the principal sum of $1,972,000, bearing interest at the rate of 3¼ per cent. per annum, of which the USHA has agreed to purchase $1,613,000 worth.

Under the terms of the municipal housing law (chap. 82, *supra,* sec. 11) and under the terms of the agreements between the city and the USHA, and under the provisions of the city's ordinances, the latter's bonds are payable exclusively from the income and revenues of the housing projects financed with the proceeds of such bonds and grants and contributions from the federal government, and from no other sources; and it is provided that such bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction. The obligee's remedy on defaulted bonds is limited to the enforcement of any pledge or lien given to him on rents, fees or revenues. Sec. 18. The city, in such agreements with the USHA, represents that the projects and bonds issued to promote them are exempt from taxation.

Plaintiff contends that chapter 82, *supra,* is unconstitutional in the following particulars:

"(a) It is in contravention of Section 17 of Article II of the Constitution in that Section 8 of said Chapter 82 attempts to vest in municipal corporations the power of eminent domain to be exercised for a private purpose, namely, acquiring of real property upon which to erect buildings for rental to persons of low income.

"(b) Said Chapter 82 is in contravention of Section 13 of Article II of the Constitution in that said act attempts to grant to a class of citizens, namely those of low income as defined in said Chapter, privileges or immunities which upon the same terms do not equally belong to all citizens of the State.

"(c) In that said Chapter 82 exempts the property acquired and the bonds issued by municipal corporations in connection with housing projects from all taxation.

"(d) In that said Chapter 82 attempts to authorize municipal corporations to incur indebtedness and issue bonds without limitation as to amount and without reference to the valuation of the taxable property in the City, in contravention of Section 8, Article IX of the Constitution.

"(e) In that said Chapter 82 attempts to authorize municipal corporations to loan credit to persons of low income in contravention of Section 7, Article IX of the Constitution of Arizona.''

Plaintiff also contends that it was error for the court to dismiss the complaint, for the following reasons:

"(a) That said contracts entered into by the City of Phoenix and United States Housing Authority, Exhibits 'B' and 'C' attached to the complaint, are *ultra vires* and void for the reason that said contracts by their terms attempt to bind the City of Phoenix in its future action upon matters of governmental and legislative policies and attempts to require of said city that it use its police power in the particulars required by said contracts.

"(b) That said agreements require that the City of Phoenix spend public funds and use public property for private uses, viz., providing dwellings for rental to persons of low income.

"(c) That City of Phoenix is precluded from entering into said contracts, Exhibits 'B' and 'C', or from exercising any of the powers conferred upon municipalities by said Chapter 82 for the reason that said City operates under a charter form of government adopted pursuant to Sections 2 and 3 of Article XIII, Constitution of Arizona, and the legislature is without power to confer upon said City of Phoenix powers in addition to those contained in its charter.

"(d) That said Ordinance No. 3018, Exhibit 'D' of the complaint, is null and void for the reason that the charter of the City of Phoenix does not authorize its commissioners to delegate to said Housing Authority any of its powers or functions or those of its City Manager and other officers.

"(e) In that by the provisions of Section 1, Chapter IX, Charter of the City of Phoenix, it is expressly

provided that all contracts of said city shall be drawn under the supervision of the city attorney, must be executed in writing and in the name of the city and by the city manager, except as may be otherwise provided by said charter or by law (and there is no such other provision) and must be countersigned by the City Clerk and registered by him in a book kept for that purpose.''

We will consider, in the order in which he has arranged them, the several reasons plaintiff assigns as to why chapter 82 is unconstitutional.

One of the latest decisions bearing on slum clearance and the enabling acts of the states undertaking such projects is *Housing Authority* v. *Dockweiler,* 14 Cal. (2d) 437, 94 Pac. (2d) 794, 800. When that decision was handed down (Oct. 11, 1939), thirty-two states had passed slum clearance acts, in much the same terms as ours, enabling certain of their political subdivisions to avail themselves of the proffered aid by the federal government, and in thirteen or more jurisdictions such legislation had been upheld by the courts as constitutional. We think every question raised here has been considered in said jurisdictions and held invulnerable to the constitutional objections urged in this case. We quote the list of jurisdictions, as given in *Housing Authority* v. *Dockweiler, supra,* that have held their slum clearance acts constitutional:

"Alabama—*In re Opinion of the Justices,* 235 Ala. 485, 179 So. 535, Mar. 17, 1938;

"Florida—*Marvin* v. *Housing Authority of Jacksonville,* 133 Fla. 590, 183 So. 145, July 27, 1938;

"Georgia—*Williamson* v. *Housing Authority of Augusta,* 186 Ga. 673, 199 S. E. 43, Sept. 21, 1938;

"Illinois—*Krause* v. *Peoria Housing Authority,* 370 Ill. 356, 19 N. E. (2d) 193, Jan. 26, 1939;

"Indiana—*Edwards* v. *Housing Authority of City of Muncie,* 215 Ind. 330, 19 N. E. (2d) 741, Mar. 13, 1939;

"Kentucky—*Spahn* v. *Stewart,* 268 Ky. 97, 103 S. W. (2d) 651, Mar. 26, 1937;

"Louisiana—*State ex rel.* v. *Housing Authority of New Orleans,* 190 La. 710, 182 So. 725, June 27, 1938;

"Montana—*Rutherford* v. *City of Great Falls,* 107 Mont. 512, 86 Pac. (2d) 656, Jan. 21, 1939;

"Montana—*State ex rel. Helena Housing Authority* v. *City Counsel of City of Helena,* 108 Mont. 347, 90 Pac. (2d) 514, May 10, 1939;

"New York—*New York City Housing Authority* v. *Muller,* 270 N. Y. 333, 1 N. E. (2d) 153, 105 A. L. R. 905, Mar. 17, 1936;

"North Carolina—*Wells* v. *Housing Authority of Wilmington,* 213 N. C. 744, 197 S. E. 693, June 15, 1938;

"Pennsylvania—*Dornan* v. *Philadelphia Housing Authority,* 331 Pa. 209, 200 Atl. 834, June 30, 1938;

"South Carolina—*McNulty* v. *Owens,* 188 S. C. 377, 199 S. E. 425, October 13, 1938;

"Tennessee—*Knoxville Housing Authority* v. *City of Knoxville,* 174 Tenn. 76, 123 S. W. (2d) 1085, Jan. 21, 1939;

"West Virginia—*Chapman* v. *Huntington W. Va. Housing Authority,* 3 S. E. (2d) 502, June 13, 1939."

Other cases which have been decided since the Dockweiler case (Oct. 11, 1939), and to which our attention has been called, are: *Hogg* v. *Housing Authority of City of Rome,* (Ga. Sup.) 5 S. E. (2d) 431, Oct. 27, 1939; *Hogg* v. *City of Rome,* (Ga. Sup.) 6 S. E. (2d) 48, Nov. 17, 1939; *Matthaei* v. *Housing Authority of Baltimore City, Md.,* 9 Atl. (2d) 835, Dec. 21, 1939; *Allydonn Realty Corp.* v. *Holyoke Housing Authority,* (Mass.) 23 N. E. (2d) 665, Nov. 21, 1939; *Stockus* v. *Boston Housing Authority,* (Mass.) 24 N. E. (2d) 333, Dec. 15, 1939; *Laret Investment Co.* v. *Dickman,* (Mo. Sup.) 134 S. W. (2d) 65, Dec. 5, 1939; *In re Brewster Street Housing Site in City of Detroit,* 291 Mich. 313, 289 N. W. 493, Dec. 19, 1939; *State ex rel. Ellis* v. *Sherrill,* 136 Ohio St. 238, 25 N. E. (2d) 844, Feb. 28, 1940. We do not go into a lengthy discussion of the questions raised as to do so would be repetitious of what

has been, as we believe, correctly announced as the law by the highest courts of the jurisdictions cited.

■■ It is first contended that the proposed projects for slum clearance and low rent are private in their nature and that the attempt to vest in the city the exercise of the right of eminent domain to acquire sites for their location violates section 17, article II of the state Constitution. This contention is contrary to the expressed views of the legislature, which asserts in the municipal housing law (chap. 82) that such projects are for "public uses and purposes for which public money may be spent and private property acquired and are governmental functions of state concern." Subd. 6, sec. 2. While a declaration of this kind by the legislature is not conclusive upon the courts, such declaration is of great weight. It was made by the legislature under the state's police power to protect the health, morals, and safety of the people by providing housing and surroundings for that portion of the population unable by reason of low income to provide for themselves. *Housing Authority v. Dockweiler, supra,* and above cases.

■■ It is abundantly settled by the courts that making provision for the housing of persons of low income does not violate the constitutional provision against the "granting to any citizen, class of citizens, or corporation" other than municipal, privileges or immunities which, upon the same terms, shall not equally belong to all citizens or corporations. Sec. 13, art. II. The right to classify persons and things is recognized as a general right possessed by the legislature. In *Hazas v. State,* 25 Ariz. 453, 219 Pac. 229, 231, we said:

" . . . Laws operating uniformly upon all of a class, when the classification has a basis founded in reason, are not obnoxious to any constitutional provision with which we are familiar. Legislation of the

kind is common and often necessary. The legislative judgment in all such matters, unless palpably arbitrary, is controlling upon the courts. . . . ''

In *Housing Authority* v. *Dockweiler, supra,* it was said:

''The state statutes here invoked looking to the elimination of slums and the erection in their place and stead of safe and sanitary dwellings of low rent are not fatally defective because of their designation of families or persons of low income as the tenants thereof. The legislation does not thereby become class legislation and result in the improper granting of special privileges or immunities to a favored few. The statutory classification is neither arbitrary nor unreasonable. On the contrary, it is logical and natural. In *Fallbrook Irr. Dist.* v. *Bradley,* 164 U. S. 112, 161, 17 Sup. Ct. 56, 64, 41 L. Ed. 369, it is stated that 'It is not essential that the entire community, or even any considerable portion thereof, should directly enjoy or participate in an improvement in order to constitute a public use.' . . . ''

█ It is objected that the municipal housing law is unconstitutional because it exempts from taxation the property acquired by the city for its several slum clearance projects and also the bonds of the city issued in aid thereof. Section 2, article IX of the Constitution provides:

''That there shall be exempt from taxation all Federal, State, county and municipal property. . . . Public debt, as evidenced by the bonds of Arizona, its counties, municipalities, or other subdivisions, shall also be exempt from taxation. . . . ''

In view of this language of the Constitution, we cannot see how it can be successfully claimed that exemption of the property of the city devoted to low rent houses, or the bonds of the city issued and sold to purchase the site for such housing and the construction and installation thereof violates the state Constitution.

█ It is next contended that the municipal housing law authorizes cities and towns of the state to issue bonds and incur indebtedness for slum clearance projects without reference to the value of the taxable property therein and beyond the limits permitted by section 8, article IX of the Constitution. Turning to the housing law we find this provision:

"Sec. 11. Bonds. (a) . . . In order to carry out the purposes of this act, a city or town may issue, upon proper resolution, bonds on which the principal and interest are payable: 1. exclusively from the income and revenues of the housing project financed with the proceeds of such bonds, or, 2. exclusively from such income and revenues together with grants and contributions from the federal government.

"(b) Neither the governing body of a city or town nor any person executing the bonds shall be liable personally on any bonds by reason of the issuance thereof hereunder. The bonds and other obligations issued under the provisions of this act shall be payable solely from the sources provided in subsection (a). The bonds shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction."

In *Board of Regents of University of Arizona* v. *Sullivan,* 45 Ariz. 245, 42 Pac. (2d) 619, 625, the question was whether bonds issued by the university, to secure $623,000 to improve and enlarge its educational plant, created an indebtedness of the state within the meaning of section 5, article IX of the Constitution restricting and limiting the state's power to incur indebtedness to the sum of $350,000. The enabling act, like the present one, provided that the bonds should not be an obligation of the state but that they should be payable only out of the income of the university. We held in that case:

" ' . . . that municipal obligations, which are not payable from taxes, but are provided to be payable solely from the revenues of an independent revenue

producing asset or utility, do not constitute a debt of the municipality, within the prohibition of a constitutional or statutory debt limit. . . . ' "

See, also, *Guthrie* v. *City of Mesa,* 47 Ariz. 336, 56 Pac. (2d) 655; *Crandall* v. *Town of Safford,* 47 Ariz. 402, 56 Pac. (2d) 660; *Crawford* v. *City of Prescott,* 52 Ariz. 471, 83 Pac. (2d) 789. Following the holding in the above cases, the bonds proposed to be issued to acquire sites and to construct and install slum clearance projects do not constitute an indebtedness of the city prohibited by section 8, article IX of the Constitution.

■ The next proposition is that the municipal housing law authorizes cities and towns to loan their credit to persons of low income in contravention of section 7, article IX of the Constitution. Plaintiff does no more than state this proposition. He presents no argument to sustain it, perhaps because there is none. If it be borne in mind that slum clearance projects are means adopted by society for self-protection against crime and disease, and that money spent to prevent or eradicate these enemies is for the public good and general welfare, even though the effect is felt by a given class more than by the community at large, it will be realized the sums spent are not a gift or loan to anyone but an expenditure in the interests of the general public.

■ Plaintiff attacks the contracts (Exhibits "B" and "C" to the complaint) between the USHA and the city as *ultra vires* the powers of the city. These contracts concern the duties of the city and the Housing Authority as to water rents, maintenance of streets, etc. As is said in *McNulty* v. *Owens,* 188 S. C. 377, 199 S. E. 425, 430, *supra*:

" . . . An examination of the contract will show that the City is merely obligating itself to furnish municipal services and facilities for these tenants of

the same character as those furnished other tenants in the City of Columbia. A municipal corporation is so obligated and this provision in the contract is merely an acknowledgment of the existing law on this point. Since the property is for a public purpose and totally exempt from taxation under the provisions of the statute, the City and Housing Authority may agree on a payment in lieu of taxes, and it is within the power of the City of Columbia to agree to such payment.''

 It is contended that, because the City of Phoenix is organized and operating under a home rule charter as provided for in article XIII of the state Constitution, the legislature is without power to make the provisions of the municipal housing law operative therein. Section 2 of such article provides that a home rule charter must be ''consistent with, and subject to, the Constitution and the laws of the State.'' We think it is a well-settled rule in this jurisdiction that the general laws of the state are operative in cities incorporated under article XIII, *supra*. *Clayton* v. *State*, 38 Ariz. 466, 300 Pac. 1010; *State* v. *Jaastad*, 43 Ariz. 458, 32 Pac. (2d) 799. While slum clearance in cities and towns only is provided for by the municipal housing law, the necessity that such subdivisions of the state be kept in sanitary and safe condition is essential to the health, morals and general welfare of the whole state. In *Adler* v. *Deegan*, 251 N. Y. 467, 167 N. E. 705, 711, in discussing a similar situation, Justice CARDOZO said:

''The Multiple Dwelling Act is aimed at many evils, but most of all it is a measure to eradicate the slum. It seeks to bring about conditions whereby healthy children shall be born, and healthy men and women reared, in the dwellings of the great metropolis. To have such men and women is not a city concern merely. It is the concern of the whole state. Here is to be bred the citizenry with which the state must do its work in the years that are to come. The end to be

achieved is more than the avoidance of pestilence or contagion. The end to be achieved is the quality of men and women. . . . If the moral and physical fiber of its manhood and its womanhood is not a state concern, the question is, what is? Till now the voice of the courts has not faltered for an answer. . . .

" . . . There may be difficulty at times in allocating interests to state or municipality, and in marking their respective limits when they seem to come together. If any one thing, however, has been settled in this realm of thought by unison of opinion, it is the state-wide extension of the interest in the maintenance of life and health. The advancement of that interest, like the advancement of education, is a function of the state at large. . . . "

The contention that the city charter does not authorize the city to delegate any of its powers to the Housing Authority created by the City Commission under the authority of the municipal housing law (chap. 82) is without merit. Chapter 82, which, as we have seen, is a general law and operative within the city, provides for such delegation of power.

Finally, while the city charter does provide that the city's contracts should be drawn by the city attorney and executed by the city manager, the municipal housing law authorizes the placing of such duty and power in the Housing Authority of the city when the contract concerns slum clearance projects.

We might say that the many courts of the country that have upheld the housing laws of their states do not overlook the great help the building and installation of slum clearance projects is in relieving the prevailing unemployment situation.

We think the trial court's order dismissing the complaint for lack of facts was proper, and we therefore affirm the judgment of dismissal.

LOCKWOOD and McALISTER, JJ., concur.