[File No. 7374]

LAWRENCE FRADET, Florence Fradet, Clarence Drenth and Eleanor Drenth, on behalf of themselves and all other similarly situated, Plaintiffs and Appellants v. CITY OF SOUTHWEST FARGO, NORTH DAKOTA, a municipal corporation, The Housing Authority of Cass County, North Dakota, and Don Brekke, Joe Farrell, J. M. Dahle, Howard Potter, Jr., and Wayne Ostlund, as commissioners of The Housing Authority of Cass County, North Dakota, Defendants and Respondents.

(59 NW2d 871)

Opinion filed July 22, 1953. Rehearing denied Sept. 16, 1953

*Cupler, Tenneson, Serkland & Leahy,* for appellants.

*Ohnstad & McCauley,* for respondents.

MORRIS, Ch. J. The plaintiffs are citizens, residents, taxpayers, and owners of property in the City of Southwest Fargo and bring this action on behalf of themselves and all others similarly situated. The defendant City of Southwest Fargo was incorporated as a city under the laws of North Dakota on or about January 25, 1947, and according to the federal census of 1950 then had a population of 1,032.

The Housing Authority of Cass County, North Dakota, was created by Section 4, Chapter 102 SLND 1937 (Section 23–1102 NDRC 1943). On April 5, 1951, the Board of County Commissioners of Cass County adopted a resolution, in form and content complying with Section 23–1103 NDRC 1943, declaring that there was need for a housing authority in the County of Cass and on the same day by another resolution appointed five persons as commissioners of the authority created for Cass County as prescribed by Section 23–1105 NDRC 1943. These five commissioners, the Housing Authority of Cass County, and the City of Southwest Fargo are made defendants in this action in which the plaintiffs allege the performance of various illegal acts on the part of the defendants in connection with the creation and activation of a slum clearance and housing project within the City of Southwest Fargo, including the execution of a contract known as a cooperation agreement entered into between the Housing Authority of Cass County and the City of Southwest Fargo on April 10, 1951. The plaintiffs ask the court to restrain the defendants from continuing the alleged illegal acts and from carrying out the terms of the cooperation agreement.

In the course of their attack the plaintiffs challenge the constitutionality of the State Housing Authorities Law, Chapter 23–11 NDRC 1943, as amended by the 1949 Supplement to NDRC.

Ferch v. The Housing Authority of Cass County and the City of Southwest Fargo, ante, 799, 59 NW2d.849, currently decided, involves the same facts, including the cooperation agreement; the same housing authority; and the same city as are involved in this action. We there considered at length the constitutionality of the Housing Authorities Law as against the same challenges that are raised herein. These challenges will not be further considered here, with one exception, upon which the plaintiffs lay great emphasis. They contend that the provisions of the State Housing Authorities Law granting preference to persons of low income is contrary to and in violation of Section 20 of the state constitution. This section provides:

"No special privileges or immunities shall ever be granted which may not be altered, revoked or repealed by the legislative assembly; nor shall any citizen or class of citizens be granted privileges or immunities which upon the same terms shall not be granted to all citizens."

The Housing Authorities Law definitely favors persons of low income. This term is defined by Section 23–1101 as follows:

" 'Persons of low income' shall mean persons or families who lack the amount of income which is necessary, as determined by the authority undertaking the housing project, to enable them, without financial assistance, to live in decent, safe, and sanitary dwellings without overcrowding; . . . ."

Section 23–1114 NDRC 1943 authorizes the housing authority to rent or lease dwelling accommodations only to persons of low income, and further prescribes:

"It shall not accept any person as a tenant in any housing project if the person or persons who would occupy the dwelling accommodations have an aggregate annual income in excess of five times the annual rental of the quarters to be furnished such person or persons."

The plaintiffs argue that the privileges thus conferred upon persons of low income constitute an unconstitutional classification by the legislature and that the classification is artificial, capricious, arbitrary, and unreasonable and renders the State Housing Authorities Law void. In support of their contention the plaintiffs cite Herr v. Rudolf, 75 ND 91, 25 NW2d 916, 169

ALR 1388, and State ex rel. Mitchell v. Mayo, 15 ND 327, 108 NW 36. In the latter case the constitutionality of a statute pertaining to the distribution of the interest and penalty collected on taxes was involved. The statute was held in part unconstitutional on the ground it was unreasonably discriminatory because

"The city taxpayers are to be given the exclusive enjoyment of the interest and penalties collected at the expense of the county from city taxpayers, but the county taxpayers must share the interest and penalties on taxes in the rural district with the city taxpayers."

In that case the classification, if such it may be called, was purely arbitrary and bore no relation to any reasonable or lawful purpose which the act might be said to accomplish. This court stated the proper rule in Herr v. Rudolf, supra, as follows:

"Where a statute creates a classification of citizens to be differently affected by the same general rule, the classification must be natural and not artificial, reasonable and not arbitrary. or capricious, and must rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed."

In Section 2 of the original State Housing Authorities Act, Chapter 102 SLND 1937, we find a declaration of necessity which, in part, says:

"It is hereby declared: (a) that there exist in the State insanitary or unsafe dwelling accommodations and that persons of low income are forced to reside in such insanitary or unsafe accommodations; that within the State there is a shortage of safe or sanitary dwelling accommodations available at rents which persons of low income can afford and that such persons are forced to occupy over crowded and congested dwelling accommodations; that the aforesaid conditions cause an increase in and spread of disease and crime and constitute a menace to the health, safety, morals and welfare of the residents of the State and impair economic values; that these conditions necessitate excessive and disproportionate expenditures of public funds for crime prevention and punishment, public health and safety, fire and accident protection, and other public services and facilities; . . . ."

·In view of the declared purpose of the State Housing Authorities Law, which we have already held in Ferch v. The Housing Authority of Cass County and the City of Southwest Fargo, supra, to be a proper public purpose, it is clear to us that the favored classification of "persons of low income" is neither artificial, capricious, arbitrary, nor unreasonable and is not violative of Section 20 of the North Dakota Constitution.

The housing authority acts of other states have faced similar challenges which were rejected in these cases: Thomas v. Housing and Redevelopment Authority of Duluth, 234 Minn 221, 48 NW2d 175; McLaughlin v. Housing Authority of City of Las Vegas, 68 Nev 84, 227 P2d 206; Housing Authority of Los Angeles v. Dockweiler, 14 C2d 437, 94 P2d 794; Humphrey v. City of Phoenix, 55 Ariz 374, 102 P2d 82; Spahn v. Stewart, 268 Ky 97, 103 SW2d 651; Housing Authority of City of Dallas v. Higginbotham, 135 Tex 158, 143 SW2d 79, 130 ALR 1053; Denard v. Housing Authority of Fort Smith, 203 Ark 1050, 159 SW2d 764; Franco v. City of New Haven, 133 Conn 544, 52 A2d 866; Williamson v. Housing Authority of Augusta, 186 Ga 673, 199 SE 43; New York City Housing Authority v. Muller, 270 NY 333, 1 NE2d 153, 105 ALR 905; Benjamin v. Housing Authority of Darlington County, 198 SC 79, 15 SE2d 737; Krause v. Peoria Housing Authority, 370 Ill 356, 19 NE2d 193; In re Brewster Street Housing Site, 291 Mich 313, 289 NW 493.

The plaintiffs assert that the State Housing Authorities Law has no application and contains no authority for the establishment of housing projects in cities having a population of less than five thousand. This argument is based on the title to the original Housing Authorities Act, Chapter 102 SLND 1937, and on the provisions of the law itself. The title to the original act states that it is

"An Act to declare the necessity of creating public bodies corporate and politic to be known as housing authorities to undertake slum clearance and projects to provide dwelling accommodations for persons of low income; to create such housing authorities in cities having a population of more than 5,000 inhabitants and in Counties; . . .."

Section 23–1101 NDRC 1943, subsection 2, provides:

" 'City' shall mean any city having population of more than five thousand inhabitants according to the last federal or state census and 'the city' shall mean the particular city for which a particular housing authority is created; . . . ."

Subsection 3 provides:

" 'County' shall mean any county in this state and 'the county' shall mean the particular county for which a particular housing authority is created; . . . ."

Subsection 7 states that the area of operation shall include:

"In the case of a housing authority of a county, all of the county except that portion which lies within the territorial boundaries of any city; . . . ."

It is argued that the latter provision excludes from the area of operation of a county housing authority all territory lying within a city; that a city housing authority only includes cities having more than five thousand inhabitants; and that therefore cities having populations of five thousand or less may not be included either in a city housing authority or a county housing authority. It is unreasonable to assume that the legislature intended any such result. We conclude that the legislature intended that all areas of population other than cities of more than five thousand inhabitants were to be included within the area of operation of the county housing authority. Any possible doubt as to the meaning of the legislature is dispelled by reference to the original act. Chapter 102 SLND 1937, section 3 (f) states:

" 'Area of Operation:' . . . in the case of a housing authority of a County, shall include all of the County except that portion which lies within the territorial boundaries of any city *as herein defined.*" (Italics supplied.)

The act having defined cities as those having a population of more than five thousand inhabitants, it is clear that the area of a county housing authority was intended to include all territory of the county not lying within cities of the prescribed population. The change in wording wrought by the omission of the phrase "as herein defined" was made by the code commission and in the original reviser's notes it is stated that this section "was revised in form for clarity and brevity without change in meaning." It is apparent that the legislature, in the original

act and in adopting the code, had no intention of omitting from the operation of the Housing Authorities Law cities having a population of five thousand or less.

The plaintiffs contend that the Housing Authority of Cass County was never legally created and seek to show that the resolution of April 5, 1951, adopted by the Board of County Commissioners of Cass County declaring that there was a need for. a housing authority in Cass County was arbitrary and amounted to an abuse of power. We will pass over the question of whether the plaintiffs as private parties have a right to challenge the existence of a public body corporate and politic, such as the one here involved, and discuss the merits of the contention.

It should be noted that Section 23-1102 NDRC 1943 creates a housing authority in each county of the state whether there is need for it or not. Although thus created, it lies dormant until the governing body of the county, by resolution, declares that there is need for the authority to function in the county.

"The determination as to whether there is such need may be made by the governing body on its own motion and shall be made upon filing of a petition signed by twenty-five residents of the city or county, as the case may be, asserting that there is need for such authority to function in such city or county and requesting that the governing body so declare."

In this case the determination was made by the board of county commissioners on its own motion. According to the testimony of a member of the board of county commissioners, a group of probably a half dozen citizens of Southwest Fargo and their attorney appeared before the board of county commissioners. The witness says:

"They asked us if we were in favor of a housing unit for Southwest Fargo and we told them as far as we were concerned we had no objection, because we knew the housing situation was short and we. had no objection."

The witness also testified that the county commissioners did not make any independent investigation or survey of the housing conditions in Southwest Fargo. From that it is argued that the action of the board of county commissioners was arbitrary and that the passage of the resolution of necessity was an abuse

of discretion. We do not agree. The law does not require the board of county commissioners to hold a hearing, nor does it prescribe to what extent an investigation, independent or otherwise, must be made. The statute permits the board to make the determination of necessity upon its own motion. This it did. The fact that the members of the board did not conduct an independent investigation does not establish that they were unfamiliar with or incompetent to make a determination with respect to the housing necessities in Cass County. The members of the board undoubtedly believed in good faith that there was such a need. We do not conclude from the mere fact that they did not make an independent investigation that their determination was arbitrary and their action in passing the resolution is void. Woodworth v. Gallman, 195 SC 157, 10 SE2d 316.

We would further point out that Section 23–1104 NDRC 1943 provides that:

"In any suit, action, or proceeding involving the validity or enforcement of, or relating to, any contract of the authority, the authority shall be conclusively deemed to have become established and authorized to transact business and exercise its powers hereunder upon proof of the adoption of a resolution by the governing body of the city or county declaring the need for the authority. Such resolution shall be deemed sufficient if it declares that there is need for an authority and finds that either or both of the conditions enumerated in section 23–1103 exist in the city or county, as the case may be."

Section 23–1103 NDRC 1943 provides that the resolution must contain a finding:

"1. That insanitary or unsafe inhabited dwelling accommodations exist in the city or county; or

"2. That there is a shortage of safe or sanitary dwelling accommodations in such city or county available to persons of low income at rentals they can afford to pay."

The resolution in question finds that both of these conditions exist in Cass County. The plaintiffs' challenge to the legality of the creation and establishment of the Housing Authority of Cass County is not well taken.

The final and perhaps the most difficult question confronting us grows out of Exhibit A, an instrument known as a "Cooperation Agreement" entered into on April 10, 1951, between the Housing Authority of Cass County, designated as the "local authority," and the City of Southwest Fargo, called the "municipality." The plaintiffs vigorously assert that this agreement is wholly beyond the powers of the city to execute or carry out and is ultra vires and void. In a two pronged attack the plaintiffs contend that the execution of such a contract in general is wholly ultra vires and that in any event certain specific provisions therein contained pledge the city to do certain acts that it has no power or authority to do.

With respect to the general contention of ultra vires, the plaintiffs cite Stern v. City of Fargo, 18 ND 289, 122 NW 403, in which this court said:

"It is well settled that incorporated cities have only the following powers: (1) Those granted in express words; (2) those necessarily implied or incident to the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable; (4) that doubtful claims of power, or doubt or ambiguity in the terms used by the Legislature, are resolved against the corporation."

In a number of subsequent cases we have adhered to the general rule that cities are agencies of the state and have only the powers expressly conferred upon them by the legislative branch of the government or such as may be necessarily implied from the powers expressly granted. The Village of North Fargo v. Fargo, 49 ND 597, 192 NW 977; State ex rel. Dreyer v. Brekke, 75 ND 468, 28 NW2d 598; City of Fargo v. Sathre, 76 ND 341, 36 NW2d 39; James v. Young, 77 ND 451, 43 NW2d 692.

In Chapter 40–05 NDRC 1943 we find a general enumeration of the powers of all municipalities and in Section 40–0501 NDRC 1943 it is stated that:

"The governing body of a municipality shall have the power: ". . . To enact or adopt all such ordinances, resolutions, and regulations, not repugnant to the constitution and laws of this state, as may be proper and necessary to carry into effect the powers granted to such municipality or as the general wel-

fare of the municipality may require, and to repeal, alter, or amend the same."

The plaintiffs argue that there is no express legislative authority vesting in the city power to enter into a cooperation agreement with a county housing authority and that the doctrine of implied powers cannot be expanded to justify such authority upon the ground that the legislature assumed that cities had power to cooperate in the housing program because the Housing Authorities Law expressly gives such power to the housing authority. Their assertion of the absence of express authority is correct. Its absence does not impel us to the conclusion that no implied authority can exist. The question is not whether the legislature assumed that the cities had such power but whether the legislature intended them to have it. The ultimate search therefore is to ascertain the legislative intention in enacting the housing authorities law. Cities already had the power to enact or adopt all such ordinances, resolutions, and regulations not repugnant to the constitution and laws of the state as the general welfare of the municipality may require when the legislature provided for a public body corporate and politic in each county in the state which, when activated by the governing body of the county, had authority to function throughout the county, both in and out of municipalities, except in cities having a population of more than five thousand inhabitants. The county housing authority, by Section 23–1111 NDRC 1943, was given thirty-four enumerated powers, among them being:

"7. To prepare, carry out, acquire, lease, and operate housing projects within its area of operation.

"8. To provide for the construction, reconstruction, improvement, alteration, or repair of any housing project, or any part thereof, within its area of operation;

"9. To arrange or contract for the furnishing by any person or any public or private agency of services, privileges, works, or facilities for, or in connection with, a housing project or the occupants thereof; . . . ."

The original Housing Authorities Law contained no direct reference to a cooperation agreement between the housing authority and the municipality in which a particular housing pro-

ject was located but it is clearly implied by Section 23–1129 NDRC 1943 that the housing project could obtain normal government services and the use of normal facilities from the city in which the project was located. That section, after providing that the property of the authority was public property and exempt from all taxes and special assessments of the city, states:

"In lieu of such taxes or special assessments, an authority may agree to make payments to the city, county, state, or any such political subdivision for improvements, services, and facilities furnished thereby for the benefits of a housing project, but in no event shall such payments exceed the estimated cost to such city, county, or political subdivision of the improvements, services, or facilities to be so furnished."

When we take into consideration the general welfare clause already in the municipal law and the finding and declaration of necessity contained in Section 2 of Chapter 102 SLND 1937, which we have already quoted, emphasizing the necessity for and the purpose of the law, which was to relieve the shortage of safe and sanitary accommodations available at rents which persons of low income could afford and to thereby combat the increase in the spread of disease and crime and alleviate conditions which cause a menace to health, safety, morals, and welfare of the people, it is the clear implication of the sections of the Housing Authorities Law to which we have referred that cities should cooperate with the local housing authorities in the creation and development of housing projects within their borders by making available to them the services and facilities commonly and normally furnished to other residents of the municipality. Both the housing authority and the city are agencies of the state. The legislature intended that they would cooperate with and deal with each other within the respective spheres of their powers, either express or implied. This conclusion is strengthened by the act of the 1941 legislature which extended housing authority activity into the realm of national defense by furnishing housing for persons engaged in national defense activities. This was a new and separate purpose which may, at least in some instances, have fallen beyond the scope

of general welfare of cities. In order to make certain of the power of cities and other public bodies to cooperate with housing authorities in this new field it was provided by Section 4, Chapter 217 SLND 1941; Section 23–1133 NDRC 1943 that:

"*Any city,* county, or other public body *shall have the right and power to cooperate with housing authorities,* or with the federal government, with respect to the development or administration of projects to assure the availability of safe and sanitary dwellings for persons engaged in national-defense activities *which such city,* county, or other public body *has for the purpose of assisting the development or administration of slum clearance or housing projects for persons of low income.*" (Italics supplied.)

The enactment of this legislation clearly reveals that in the opinion of the legislature any city, county, or other public body had the right to cooperate with housing authorities in the development of projects for the purpose of housing persons of low income or in aid of slum clearance and that power was by Section 23–1133 extended to make available housing for persons engaged in national defense activities. That the legislature was still of the same mind eight years later is disclosed by Section 3, Chapter 191 SLND 1949 whereby the power of cities, counties, or other public bodies to cooperate with housing authorities was further extended so as to assure the availability of safe and sanitary dwellings for veterans of World Wars I and II.

Construction of statutes is a judicial and not a legislative function but the construction given to a statute by the legislature is entitled to weight in determining the legislative intention. Finlayson v. Peterson, 5 ND 587, 67 NW 953. In construing statutes the courts frequently refer to subsequent legislation as indicating or at least aiding in the determination of the intention of the legislature at the time of the adoption of the original act. 50 Am Jur Statutes, Section 337; Sutherland, Statutory Construction, Third Edition, Section 5110; 59 CJ, Statutes, Section 612.

In Cordes v. Board of Supervisors of Hamilton County, 197 Iowa 136, 196 NW 997, a challenge was made to the authority of the board of supervisors to establish a drainage district with-

in the limits of the incorporated town of Kamrar. It appears that the statutes of Iowa did not expressly authorize the establishment of a drainage district wholly within the limits of a town. After citing two pertinent statutes, the court said:

"It is contended that neither of these enactments amounts to a direct grant of power to establish a drainage district wholly within the limits of a town. They are, however, an unequivocal recognition by the legislature that the power already existed. These acts were in force at the time the proceedings in question were begun. While a legislative construction of a prior statute is not binding upon the courts, it is entitled to consideration. *Prime v. McCarthy,* 92 Iowa 569; *Elks v. Conn,* 186 Iowa 48; *Slutts v. Dana,* 138 Iowa 244. The rule is even more broadly stated by the United States Supreme Court, which holds that, if it can be gathered from a subsequent statute *in pari materia,* what meaning the legislature attached to the words of a former statute, it will amount to a legislative declaration of its meaning, and will govern the construction of the first statute. *United States v. Freeman,* 3 How (US) 555 (11 L ed 724)."

In this case our legislature has twice spoken in a manner that can leave no doubt as to legislative interpretation, in support of the existence of the power of cities to cooperate with housing authorities. Under the circumstances here presented, this interpretation is highly persuasive.

For purposes of comparison and argument the plaintiffs cite the provisions of the Municipal Housing and Redevelopment Act of Minnesota, Section 462.581 Minnesota Statutes Annotated, where the powers of municipalities relating to redevelopment projects are set forth in detail. The Minnesota legislature has conferred upon municipalities authority that undoubtedly is in some instances broader than that intended to be conferred by our legislature in enacting the State Housing Authorities Law. The Minnesota law presents an instance of express powers while we are here considering the implied authority of a city to agree to exercise and to exercise its general powers in cooperation with a county housing authority in the development of a housing project within the city. The comparison does not weigh against the authority to be implied from our statutes. In Hum-

phrey v. City of Phoenix, 55 Ariz 374, 102 P2d 82, contracts between the city and the housing authority were attacked on the ground that they were beyond the powers of the city to execute. The court said:

"Plaintiff attacks the contracts (Exhibits 'B' and 'C' to the complaint) between the USHA and the city as *ultra vires* the powers of the city. These contracts concern the duties of the city and the Housing Authority as to water rents, maintenance of streets, etc. As is said in *McNulty* v. *Owens,* 188 SC 377, 199 SE 425, 430, *supra*:

" '. . . An examination of the contract will show that the City is merely obligating itself to furnish municipal services and facilities for these tenants of the same character as those furnished other tenants in the City of Columbia. A municipal corporation is so obligated and this provision in the contract is merely an acknowledgment of the existing law on this point. Since the property is for a public purpose and totally exempt from taxation under the provisions of the statute, the City and Housing Authority may agree on a payment in lieu of taxes, and it is within the power of the City of Columbia to agree to such payment.' "

We reach the conclusion that the City of Southwest Fargo has authority to enter into a cooperation agreement in the general form of Exhibit A, with the exception of certain paragraphs which we will discuss.

The cooperation agreement contains a provision whereby the city agrees that it will not levy or impose any real or personal property taxes on the project. This is in accordance with the exemption from taxation provided by Section 23–1129 NDRC 1943. See Ferch v. The Housing Authority of Cass County and the City of Southwest Fargo, currently decided. The agreement also provides for an annual payment in lieu of taxes which amount is not only in lieu of taxes of the municipality but of those of all other taxing bodies. The agreement then provides:

."The Municipality shall distribute the Payments in Lieu of Taxes among the Taxing Bodies in the proportion which the real property taxes which would have been paid to each Taxing Body for such year if the Project were not exempt from taxation bears

to the total real property taxes which would have been paid to all of the Taxing Bodies for such year if the Project were not exempt from taxation; Provided, however, that no payment for any year shall be made to any Taxing Body in excess of the amount of the real property taxes which would have been paid to such Taxing Body for such year if the Project were not exempt from taxation."

This paragraph of the agreement clearly places upon the cty the burden of collecting and distributing among the taxing bodies the payment made by the county housing authority in lieu of taxes on the project within the City of Southwest Fargo. A municipality is in no sense a tax collecting and distributing agency under the general laws of the state, nor is collection and distribution of other funds belonging to political subdivisions a municipal function. The State Housing Authorities Law does not, either directly or by implication, impress these duties upon the municipality. The only provision bearing upon the question is contained in Section 23–1129, which says:

"In lieu of such taxes or special assessments, an authority may agree to make payments to the city, county, state, or any such political subdivision for improvements, services, and facilities furnished thereby for the benefits of a housing project, . . . ."

Under this section it is clearly the duty of the county housing authority to make separate payments to the respective taxing bodies. The municipality has no authority to assume the burden of collection and disbursement and the attendant expense and responsibility.

Paragraph 4 of the cooperation agreement provides that:

"The Municipality agrees that, subsequent to the date of initiation (as defined in the United States Housing Act of 1937, as amended) of each Project and within five years after the completion thereof, or such further period as may be approved by the PHA, there has been or will be elimination (as approved by the PHA) by demolition, condemnation, effective closing, or compulsory repair or improvement, of unsafe or insanitary dwelling units situated in the locality or metropolitan area in which such Project is located, substantially equal in number to

the number of newly constructed dwelling units provided by such Project; Provided, that, where more than one family is living in an unsafe or insanitary dwelling unit, the elimination of such unit shall count as the elimination of units equal to the number of families accommodated therein."

We can find nothing in the State Housing Authorities Law that indicates an agreement between the housing authority and the municipality containing such a provision is contemplated. Section 23–1111, enumerating the powers and duties of the county housing authority, includes the following:

"22. To make studies and recommendations relating to the problem of clearing, replanning, and reconstructing the slum areas within its area of operation and the problem of providing dwelling accommodations for the persons of low income, and to cooperate with the city, county, or state, or any political subdivision thereof, in any action taken in connection with such problems; . . . ."

According to this provision the housing authority is to do the cooperating and the city is the dominant agency in determining what shall be done. This section of the law contains the further provision:

"26. To make available to appropriate agencies, including those charged with the duty of abating or requiring the correction of nuisances or like conditions, or of demolishing unsafe or insanitary structures within its area of operation, its findings and recommendations with regard to any building or property where conditions exist which are dangerous to the public health, morals, safety, or welfare; . . . ."

Here again the city is the dominant agency and it must act within the powers vested in it by a general law pertaining to municipalities. No additional powers in this respect are given to municipalities by the State Housing Authorities Law, either directly or by implication.

It should be noted here that the only express authority given to cities with respect to the demolition, repair, or removal of buildings is provided by Section 40–0502 NDRC 1949 Supp which was originally enacted as Chapter 252 SLND 1945. This section provides notice and hearing to the owner of the struc-

ture involved and prescribes a right of appeal. The constitutionality of an ordinance enacted under it was recently sustained in Soderfelt v. The City of Drayton, ante, 742, 59 NW2d 502. Section 4 of the agreement attempts to bind the municipality to subject its authority to act under this statute to the approval of the PHA. The agreement in this respect is clearly ultra vires.

We reach the conclusion that a city is authorized to contract with the county local authority with respect to the exercise of powers that have been granted to the city by the legislature, either expressly or by necessary implication. A city having a population of five thousand or less may enter into an agreement to cooperate with the county housing authority in the performance of functions arising from the powers so granted. The State Housing Authorities Law grants to the city no new and independent powers and in entering into a cooperation agreement with the county housing authority the obligations of the city must be limited to the performance of functions falling within the framework of the powers possessed by the municipality under other statutes.

We determine that paragraph 3c of the cooperation agreement imposing on the municipality the duty to collect and distribute payments in lieu of taxes among other taxing bodies is ultra vires and void. Paragraph 4 of the agreement is also ultra vires and void in so far as it subjects the municipality to the exercise of discretion on the part of the PHA with respect to the "elimination . . . by demolition, condemnation, effective closing, or compulsory repair or improvement, of unsafe or insanitary dwelling units situated in the locality or metropolitan area in which such Project is located, . . . ." The power of determination with respect to these matters rests in the governing body of the city and cannot be delegated to or made subject to approval by the PHA. The two objectional paragraphs contain important provisions. They cannot be stricken without a material alteration of the agreement. This court cannot write a new agreement for the parties either by addition or deletion. The plaintiffs are entitled to have performance of the agreement in its present form enjoined. The judgment appealed from is

reversed and the district court is directed to enter a judgment restraining the defendants from further execution of the cooperation agreement, Exhibit 4, entered into on the 10th day of April, 1951, between the Housing Authority of Cass County and the City of Southwest Fargo.

BURKE, SATHRE, CHRISTIANSON and GRIMSON, JJ., concur.